No. 3685.—RICHARD T. VINSON, Administrator, *v.* NUMA VIVES.

The payee of promissory notes, given for the price of a plantation, is not guilty of fraud in making a compromise with the holder thereof, whereby he obtains a reduction of the amount predicated on a depreciation of value on the property sold, on account of the casualties resulting from a state of war.

Where the wife has died after a sale by the husband of a plantation, the property of the community, but before payment has been made, the purchaser who has no knowledge of her death, is not guilty of fraud if he compromises with the husband, as vendor, by taking up his notes and giving others in their place for a less amount.

The husband, as one-half owner in his own right of community property which he has sold before the dissolution thereof by the death of his wife, and having the usufruct of the other half of the community, has the right to collect the notes given for the price of the sale.

APPEAL from the Fifteenth Judicial District Court, parish of Assumption. *Beattie,* J. *J. B. Whitington,* for plaintiff and appellant. *Nichols & Tolse,* for defendant and appellee.

WYLY, J. In 1862, James B. Vinson sold to Numa Vives his plantation in the parish of Assumption, on credit, for $41,000, and moved to the parish of Caddo, where his wife died in 1864.

In December, 1865, James B. Vinson, having in his possession the four promissory notes made by Vives, representing the price of the land, amounting in the aggregate to $41,000, called upon Vives for a settlement; the latter, owing to the disasters of the war, was unable to pay him, but was willing to return the property. Vinson, how-

ever, proposed a compromise, which was accepted, and the agreement was reduced to writing in an act under private signature. By this agreement the original debt was not to be novated, but only reduced to $24,000, Vives paying, in lieu of the original notes, $10,000 cash, and executing his six promissory notes for $2,333 33⅓ each, payable in the month of March of the years 1867, 1868, 1869, 1870, 1871 and 1872. On the 27th February, 1866, this agreement was carried into effect, as appears by the act passed by Shannon, notary. The $10,000 were paid, and the six notes were executed, the same being secured by the original mortgage, the act reciting that no novation was intended, and that said payment and said notes were given in lieu of the original notes, amounting to $41,000, which were then surrendered to Vives.

All of these six notes have since been paid, except the last two, maturing in March, 1871 and 1872.

At the time of this compromise no one was appointed to represent the succession of Mrs. Vinson, wife of James B. Vinson, who died in 1864.

Vinson was confirmed as natural tutor in 1867, all the heirs being minors but the plaintiff, Richard T. Vinson.

On the 20th of April, 1870, Richard T. Vinson was appointed administrator of his mother's succession. In August following he instituted this suit to collect from Vives the full amount of the original notes, $41,000, and to foreclose the mortgage, alleging that, as partner in community, one-half of the amount thereof belonged to his mother, and her succession being unrepresented, his father was wholly unauthorized to make the compromise in 1865, whereby the original notes were surrendered to Vives; that said compromise was entered into for the purpose of defrauding the creditors and heirs of their rights, resulting from the community hitherto existing between James B. Vinson and his deceased wife, and that the fact that said Vinson was acting without authority was well known to the defendant, Vives, who knew of the death of Mrs. Vinson prior to the agreement and the passing of the act before Shannon, notary.

The court rejected the demand of the plaintiff, and he has appealed.

It appears that, owing to the disasters of the war, the property which Vives in 1862 agreed to pay $41,000 for, was reduced to about $6000 in value when the compromise was made, in December, 1865, and all that Vives owned besides was $10,000 in cash. At the time of the compromise, therefore, Vives possessed $16,000 in property and money, and owed the notes, amounting to $41,000, exclusive of interest.

By the compromise James B. Vinson, the payee of the notes, received in cash $10,000, and also six notes maturing at different dates, all

amounting to $24,000. We do not see how Vives committed a fraud in entering into the compromise in December, 1865. By it he paid and agreed to pay $24,000 for property which he was willing to surrender to his vendor, and which it is shown was only worth $6000 at the time. J. B. Vinson is not a party to the suit, and we do not find any fraud as to him, if such could be considered in this proceeding. From the evidence we are satisfied that Vives was not aware of the death of Mrs. Vinson at the time he made the compromise. Her succession was not opened till nearly five years thereafter. Vinson was the payee and holder of the notes. We think Vives had the right to pay the notes or make any *bona fide* settlement he could with the holder and payee.

The maker of negotiable paper should be protected in the settlement he has made in good faith with the holder, in whom the legal title appears to be vested. See authorities collated in Hennen's Digest, page 180, sections 1 and 5.

Vinson had the right to collect the debt also, because he was the owner of one-half, and usufructuary of the other. 11 An. 760; 19 An. 15; 20 An. 159; 22 A. 446.

But the plaintiff contends that if he had the right to collect the debt he did not have authority to remit a part of it. This question would more properly arise in a controversy with Vinson for a settlement of the community. He had, however, the right to remit the whole of his part of the claim, subject to any attack his creditors might institute in their name for fraud, within the period prescribed by law. The amount abated was less than the amount due him individually. Of this the plaintiff has no cause to complain.

In Gilmore *v.* Bailey, 12 An. 562, where a note for paraphernal funds of the wife was merged in a judgment in the name of the husband, it was held that the judgment might be compensated by any debt equally liquidated, due by the husband to the judgment debtor; that knowledge on the part of the judgment debtor that the note on which the judgment was obtained was the property of the wife, would not prevent the compensation from taking place at any time while the legal ownership of the judgment remained in the husband. "And the reason of the rule," said the court, "is this: A judgment debtor is not to be subjected to the hazard of a litigation between the judgment creditor and a third party claiming the ownership of the judgment, which, after all, may prove unavailing; but he may at once relieve himself by making payment to him who holds the judgment rendered upon the commercial paper, and which has the effect of *res judicata* against all others."

So the maker of commercial paper is not to be subjected to the hazard of a litigation between the payee and a third party claiming

the ownership, which, after all, may be unavailing; but he may at once relieve himself by making settlement with him in whom the legal title appears to be vested, and who is the holder.

"The defendant has no right to inquire whether the plaintiff, in whom the legal title appears to be vested, be an agent or the real owner of it, unless by a fictitious assignment it be attempted to deprive him of substantial grounds of defense which he has against the true owner." See cases cited, section 5, Hennen's Digest, page 180.

Judgment affirmed. Rehearing refused.